**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                              Case No. 13-11341

ABDLMOUHAYMEN DRAK AL-SIBAI,

    Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO RULE 52(a)**

This is a civil denaturalization case pursuant to the Immigration and Nationality Act (INA) of 1952, 8 U.S.C. § 1451(a).  The three-count complaint alleges that Defendant Abdlmouhaymen Al-Sibai:  (1) illegally procured his citizenship because he was never lawfully admitted into the United States for permanent residence, (2) illegally procured his citizenship because he lacked the good moral character necessary for citizenship, and (3) fraudulently obtained his citizenship by concealing material facts and wilfully misrepresenting facts.  On May 12, 2014, the court held a bench trial at which Defendant did not appear.  Pursuant to Federal Rule of Civil Procedure 52(a), the court presents its findings of fact and conclusions of law.  For the reasons that follow, the court finds in favor of Plaintiff United States of America.

**I.  FINDINGS OF FACT**

The parties stipulated to many of the facts relevant to this case.  The court accepts the relevant stipulated facts as a portion of its findings of fact.  In addition to the stipulated facts, the court makes various supplemental findings of facts.

1. On March 23, 1959, Defendant Abdlmouhaymen Drak Al-Sibai was born in Homs, Syria. He is the son of Abdul-Hafiz Drak Al-Sibai and Layla Al-Gandali.

2. On February 12, 1979, Defendant arrived in the United States on a student visa and attended Point Park College in Pittsburgh. He subsequently moved to Detroit.

3. Sometime in 1982, Defendant met Cheryl Anne Kankula, a 24-year-old single mother living in the Detroit area. Kankula is a native-born United States citizen.

4. Kankula testified credibly and the court fully credits her testimony.

5. In 1982, Leonara Harper, Toni Bickell-Heacox, and Margaret Boling were friends with Kankula.

6. Harper, Bickell-Heacox, and Boling all testified credibly and the court fully credits their testimony. Each woman testified to the same material facts. Any minor discrepancies in their respective testimony can be attributed to the length of time that has passed since the events giving rise to this action.

7. Sometime in late 1982, Defendant asked Kankula to marry him for immigration purposes. Defendant told Kankula that if she agreed to marry him, he would pay her.

8. Defendant's student visa was set to expire on January 11, 1983.

9. On December 2, 1982, Defendant married Kankula at a barbershop in Melvindale, Michigan. No friends or family attended the wedding.

10. Defendant fraudulently entered into the marriage with Kankula to obtain immigration benefits. Specifically, Defendant married Kankula so that he could "legally" remain in the United States. Defendant and Kankula did not intend to

establish a life together. Before they married, Defendant informed Kankula that he would divorce her. Defendant and Kankula never lived together, combined assets and liabilities, or had any children together.

11. Because the marriage made Defendant a relative of a United States citizen, on January 20, 1983, Kankula filed a Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa (Form I-130) on behalf of Defendant.

12. Also on January 20, 1983, Defendant applied for Lawful Permanent Resident (LPR) status (Form I-485) based on his marriage to Kankula, a United States citizen.

13. In preparation for interviews with an official from the former Immigration and Naturalization Service (INS), Kankula visited Defendant's home. Kankula familiarized herself with Defendant's home, possessions, and culture so that she would be able to convince an INS officer that they were married and lived together even though they did not. In preparation for their INS interviews, Defendant concocted a series of lies and led Kankula in rehearsals of these lies to ensure that their stories matched.

14. On May 4, 1983, INS examiner Kim Ogden conducted a personal interview with Defendant and Kankula under oath, regarding Kankula's Petition (Form I-130) and Defendant's Application (Form I-485).

15. Ogden testified credibly and the court fully credits his testimony. Ogden does not remember the Defendant or Kankula but testified as to his typical practices when conducting personal interviews as an INS examiner.

16. Pursuant to standard INS procedure, Ogden questioned the couple about the validity of their marriage. The couple represented that they were living together. Although Defendant had not given Kankula an engagement ring, he gave her a wedding band to wear during the interview.

17. Pursuant to Ogden's recommendation, on the same day that he interviewed Kankula and Defendant, May 4, 1983, the INS approved Kankula's Petition (Form I-130) and Defendant's Application (Form 1-485), and accordingly issued Defendant a visa and granted him LPR status.

18. If Ogden had known that the marriage was a sham, he would not have recommended that the INS approve Kankula's Petition (Form I-130) or Defendant's Application (Form 1-485).

19. On September 11, 1984, Defendant and Kankula divorced at the Defendant's initiative.

20. On January 6, 1986, Defendant married Rida Atassi, a woman from Homs, Syria. Defendant and Atassi remain married today.

21. After waiting the requisite five years from acquiring LPR status, on or about April 8, 1988, Defendant applied for United States Citizenship (Form N-400).

22. On June 14, 1989, INS naturalization examiner Hershel Miller interviewed Defendant under oath.

23. Miller is now deceased.

24. From 1982 through 1993, James Montgomery served as the INS District Director in Detroit.

25. Montgomery testified credibly and the court fully credits his testimony. Although Montgomery did not interview Defendant or Kankula, his testimony explained training of INS naturalization examiners, Miller's reputation, and the procedures an examiner would follow when conducting an interview.

26. During his interview with INS naturalization examiner Miller, Defendant did not reveal that his LPR status had been acquired as a result of a sham marriage.

27. Defendant's citizenship application was approved, and on August 21, 1989, the United States District Court for the Eastern District of Michigan admitted him to United States citizenship. The court issued him Certificate of Naturalization No. 14116787.

28. If the INS had known that Defendant's marriage to Kankula was a sham, his citizenship application would have been denied.

## II. CONCLUSIONS OF LAW AND APPLICATION OF LAW TO FACTS

1. Because Defendant did not appear at the May 12, 2014 trial, the court will apply an adverse inference. Under the so-called "missing witness" rule, an adverse inference arises "when a party fails to call a witness peculiarly within his power to produce and whose testimony would elucidate the transaction." *Bennett v. United States Dep't of Agric.*, 219 Fed. App'x. 441, 447 (6th Cir. 2007) (quotation marks and alterations omitted) (quoting *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973)). The court finds that the *Blakemore* test has been met because Defendant is "peculiarly within" the control of himself and, as one of the two individuals in the marriage between himself and Kankula, his "testimony

would elucidate [that] transaction." Therefore, the court draws an adverse inference from Defendant's failure to appear and testify at his trial.

2. In a denaturalization proceeding, the evidence justifying revocation of citizenship must be "clear, unequivocal, and convincing." *United States v. Dailide*, 227 F.3d 385, 389 (6th Cir. 2000) (citing *Fedorenko v. United States*, 449 U.S. 490, 505 (1981)). Under this "heavy" burden, the evidence should "not leave the issue in doubt." *Id.*

3. Under the INA, if a person "illegally procured" his citizenship or otherwise procured it "by concealment of a material fact or by willful misrepresentation," then the person's citizenship must be revoked. § 1451(a).

4. Naturalization is legally procured if there has been "strict compliance with all the congressionally imposed requisites to the acquisition of citizenship." *Fedorenko*, 449 U.S. at 506; *see also United States v. Demjanjuk*, 367 F.3d 623, 629 (6th Cir. 2004). Accordingly, "a naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)." *Fedorenko*, 449 U.S. at 514; *see also United States v. Mandycz*, 447 F.3d 951, 956 (6th Cir. 2006).

5. "A marriage was a sham if the bride and groom did not intend to establish a life together at the time they were married." *King v. Holder*, 570 F.3d 785, 788 (6th Cir. 2009) (citations and internal quotation marks omitted). "The parties' intent may be assessed by circumstantial evidence about the amount of commitment to the marital relationship, including whether assets and liabilities were combined, the duration of cohabitation, whether children were born to the marriage, and

6

other pertinent evidence." *Id.* (citations omitted). Defendant's marriage to Kankula was a sham.

### A. Count I: Defendant Illegally Procured his Citizenship because he was never lawfully Admitted into the United States for Permanent Residence

6. One prerequisite to citizenship is lawful admittance as a permanent resident; if the individual's admission as a lawful permanent resident was unlawful, any subsequent naturalization is unlawful. § 1427(a)(1) ("No person . . . shall be naturalized unless such applicant (1) . . . has resided continuously, after being lawfully admitted for permanent residence, within the United States"); *see also Demjanjuk*, 367 F.3d at 636; *Dailide*, 227 F.3d at 390.

7. Admission as a lawful permanent resident requires that the applicant enter the United States pursuant to a valid immigrant visa. *Fedorenko*, 449 U.S. at 515.

8. Defendant originally came to the United States on a student visa in 1979. However, for immigration purposes, Defendant entered the United States on May 4, 1983, when the INS approved Kankula's Petition (Form I-130) and issued Defendant an immigrant visa. On the same day, the INS approved Defendant's Application (Form 1-485) and granted him LPR status. However, the Defendant's status of an alien could have been legally adjusted to that of an LPR only if he was legally eligible to receive an immigrant visa. § 1255(a)(2) ("The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted . . . to that of an alien lawfully admitted for permanent residence if . . . the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.").

9. An individual who has entered into a sham marriage is not legally eligible to receive an immigrant visa through that marriage. § 1154(c) ("[N]o petition [for an immigrant visa] shall be approved if . . . the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws."); *see also Ghaly v. I.N.S.*, 48 F.3d 1426, 1435–36 (7th Cir. 1995) (Posner, J., concurring) ("If an alien attempts or conspires to enter into a marriage for the purpose of evading the immigration laws, he is ineligible for an immigrant visa. § 1154(c)(2). This means that he can never become a citizen of the United States or even reside permanently in this country.").

10. Entry in the United States under an invalid visa or unlawful admittance as a permanent resident constitutes a failure to comply with congressionally imposed statutory prerequisites to citizenship, making an individual's certificate of citizenship revocable as illegally procured under § 1451(a). Defendant entered into a sham marriage with Kankula and thus was not legally eligible to receive the immigrant visa the INS issued him. Further, because he was not eligible to receive an immigrant visa, Defendant's status of an alien could not have been legally adjusted to that of an LPR. Therefore, Defendant illegally procured his citizenship and his citizenship must be revoked

### B. Count II: Defendant Illegally Procured his Citizenship because he Lacked the Good Moral Character Necessary for Citizenship

11. Being an person of good moral character is another perquisite to citizenship. § 1427(a) ("No person . . . shall be naturalized unless such applicant . . . (3) during all the time referred to in this subsection has been and still is a person of

good moral character"); *see also United States v. Koziy*, 728 F.2d 1314, 1319 (11th Cir. 1984). The statute explains that in determining whether the applicant has established good moral character as "specified in subsection (a) of this section, the Attorney General shall not be limited to the applicant's conduct during the five years preceding the petition, but may take into consideration as a basis for such determination the applicant's bad acts at any time prior to that period." § 1427(e).

12. An individual who has given false testimony to obtain immigration benefits during the statutory period is not a person of good moral character. § 1101(f)(6) ("No person shall be regarded as . . . a person of good moral character who . . . has given false testimony for the purpose of obtaining any benefits under this [Immigration and Nationality] Act."); *see also Kungys v. United States*, 485 U.S. 759, 779–80 (1988) ("Literally read, [ § 1101(f)(6)] denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits.").

13. Lacking good moral character is a failure to comply with congressionally imposed statutory prerequisites to citizenship which, in turn, renders any certificate of citizenship revocable as illegally procured under § 1451(a). Defendant gave false testimony under oath during his 1983 interview with Ogden and during his 1989 interview with Miller because he represented that his marriage to Kankulla was *bona fide* and that he lived with her. Defendant is not a person of good

moral character.  Because Defendant illegally procured his citizenship, his citizenship must be revoked.

### B.  Count III: Defendant Fraudulently Obtained his Citizenship by Concealing Material Facts and Wilfully Misrepresenting Facts

14. As noted earlier, under the INA, if a person "illegally procured" his citizenship or otherwise procured it "by concealment of a material fact or by willful misrepresentation," then the person's citizenship must be revoked.  § 1451(a).

15. A fact is material if, upon disclosure, it would have had "a natural tendency to influence the relevant decision-maker's decision."  *Demjanjuk*, 367 F.3d at 636 (citing *Kungys v. United States*, 485 U.S. 759, 771–72 (1988)).  Moreover, "although a false statement must have the *capacity* to influence a decision, it does not have to be actually influential in order to be material."  *United States v. Frost*, 125 F.3d 346, 387 (6th Cir. 1997); *see also United States v. Kone*, 307 F.3d 430, 435 (6th Cir. 2002).

16. Given that a fraudulent marriage to obtain immigration benefits precludes an individual from citizenship, knowledge of the fraudulent nature of Defendant's marriage would have had "natural tendency to influence" the INS.  Moreover, Ogden and Montgomery testified as much.  Because Defendant did not reveal to the INS the material fact that his marriage to Kankulla was a sham, he procured his citizenship "by concealment of a material fact or by willful misrepresentation," and his citizenship must be revoked.

## IV. CONCLUSION

For the foregoing reasons, the court finds that Defendant illegally procured his citizenship because he was never lawfully admitted into the United States for permanent residence and he lacked the good moral character necessary for citizenship. The court also finds that Defendant procured his citizenship "by concealment of a material fact or by willful misrepresentation." Accordingly,

IT IS ORDERED that Defendant's United States citizenship is REVOKED.

IT IS FURTHER ORDERED that the August 21, 1989 order of the United States District Court for the Eastern District of Michigan admitting Defendant to United States citizenship is VACATED.

Finally, IT IS ORDERED that Defendant's Certificate of Naturalization No. 14116787 is VACATED.

A separate judgment will be entered.

      s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: June 5, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 5, 2014, by electronic and/or ordinary mail.

      s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522